IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE, INDIANA

| | | |
|---|---|---|
| EMILY LEWIS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:19-cv-00451-WCL-SLC |
| | ) | |
| INDIANA WESLEYAN UNIVERSITY | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## I.       INTRODUCTION

Indiana Wesleyan University hired Dr. Emily Lewis as Director of Instructional Design in the Center for Learning and Innovation in December 2016. Unfortunately, Lewis came into severe conflict with all the Instructional Design team members who reported to her. Upon learning of the severity of the situation, Lewis' supervisor, Executive Director Dr. Lorne Oke, consulted with Human Resources in early August 2018 and determined that Lewis needed to be removed from her supervisory role. Lewis complained that the problems with her subordinates and the decision to remove her from supervising them were due to her race (black) or sex. The university saw no evidence to support this belief. Lewis then became Director of Support for Research and Learning, still a Director-level position, but without subordinates reporting to her.

As a result of institutional realignment Oke subsequently moved to a different position and Dr. Erin Crisp succeeded him as Executive Director of the CLI and became Lewis' supervisor. Crisp evaluated all the positions in the CLI and determined that in her opinion Lewis' position did not align with IWU's strategic plan and her vision for the reorganized CLI. Crisp, who was unaware of Lewis' previous complaint of discrimination at the time, decided to

eliminate Lewis' position.  Lewis declined a Research Assistant position that Crisp offered to create for her, so Lewis' employment ended on August 31, 2019.

Lewis has sued, alleging a variety of claims of race, sex, and age discrimination, as well as retaliation, under Title VII, 42 U.S.C. § 1981, and the ADEA. Lewis, however, is unable to establish a *prima facie* case of discrimination or retaliation, and in any case is unable to show that IWU's legitimate reasons for its actions are pretext for unlawful discrimination or retaliation. IWU therefore respectfully requests that the Court grant summary judgment in its favor on each of Lewis' claims.

## II.   STATEMENT OF MATERIAL FACTS

### A.   IWU's Center for Learning and Innovation

Indiana Wesleyan University ("IWU") is a Christian university established by The Wesleyan Church. (L.D. 20:5-9; Oke Aff., ¶ 3)[1] With its home campus in Marion, Indiana, IWU also offers over 100 degree programs online.  (Oke Aff., ¶ 3) IWU's Center for Learning and Innovation ("CLI") provides curriculum development support for IWU's online education program. (L.D. 41:23-25; 44:19-45:13)  The CLI is under the supervision of an Executive Director, who in 2016 was Dr. Lorne Oke ("Oke"). (L.D. 41:18-22; 42:1-3; O.D. 8:18-22; Oke Aff., ¶ 2) One team within the CLI was the Instructional Design team, which worked with faculty members on how to develop and deliver online educational content in the most effective ways. (L.D. 44:19-45:13)  The team was comprised of about five or so Instructional Designers ("IDs"), who reported to the Director of Instructional Design, who in turn reported to the Executive Director. (L.D. 41:18-22; 45:14-46:1; and Ex. 8; O.D. 11:23-12:2; 17:17-24).

---

[1]      "L.D. __:__ and Ex. __" references pages, lines and exhibit numbers from the deposition transcript of Emily Lewis; "O.D." references the deposition of Lorne Oke; "C.D." references the deposition of Erin Crisp.

B.    **Oke Hires Lewis As Director of Instructional Design**

In 2016 there was a vacancy for the Director of Instructional Design position.  (Oke Aff.,
¶ 4)  Nick Rider ("Rider"), the Senior ID, served as the interim director for several months while
IWU advertised the opening.  (L.D. 45:24-46:7;  O.D. 30:16-25;  Oke Aff., ¶ 4)  Rider did not
apply for the position.  (Oke Aff., ¶ 4)  There were a number of applicants, and the list was
narrowed to three finalists.  (Oke Aff., ¶ 4)  Dr. Emily Lewis ("Lewis"), an African American
woman born in 1960, was one of the finalists.  (L.D. 9:4-5)  Lewis does not know who the other
finalists were or anything about their race, sex or age. (L.D. 35:21-36:2)  One of the other two
finalists was a white woman in her 50s, the third was a white male of unknown age. (Oke Aff., ¶
4)  All three of the finalists were interviewed on campus by Oke and other hiring committee
members. (L.D. 35:7-20; O.D. 16:23-25; Oke Aff., ¶ 4)  Oke selected Lewis as his preferred
candidate and IWU approved his request for her hire. (L.D. 56:9-13;  O.D. 17:1-6;  Oke Aff., ¶ 4)
At the time of her hire in December 2016 Lewis was 56 years of age and Oke was 53 years of
age. (L.D. 41:15-16;  Oke Aff., ¶ 1).

C.    **Lewis Gets Into Conflict With The Senior Instructional Designer, Who
      Resigned As A Result**

Shortly after her hire, friction began to develop between Lewis and Rider. (Oke Aff., ¶ 5)
Rider told Oke that he often found Lewis' instructions confusing and that no matter what he did
it seemed there was no way to please Lewis. (L.D. 46:23-47:2;  Oke Aff., ¶ 5)  Lewis told Oke
she thought Rider did not want to work for her or take instruction from her because she was
black.[2] (Compl., ¶ 11; L.D. 50:9-21;  Oke Aff., ¶ 5)  Rider never said anything about Lewis' race
to Lewis or Oke. (L.D. 54:18-20;  Oke Aff., ¶ 5) Instead, it was only Lewis who raised race as an

---

[2]    The Complaint also alleges that Lewis thought Rider had issues taking orders from her because she is a
woman. However, Lewis testified in her deposition she is not claiming Rider necessarily had issues taking order
from her because of her sex.  (L.D. 56:10-17)

issue. (L.D. 52:16-25)  Oke did not perceive race to have anything to do with the differences between Lewis and Rider. (Oke Aff., ¶ 5) Oke's perception of the conflict was that a lot of activity on the team revolved around Rider as he was well respected by the other IDs, was the senior ID, and had been functioning as interim Director. (Oke Aff., ¶ 5) As Oke was working to separate the roles Lewis and Rider would play, while still providing continuity for the staff, it appeared to Oke that perhaps Lewis viewed Rider as a threat to her authority. (Oke Aff., ¶ 5) From Oke's perspective it also appeared that Lewis was attempting to assume control of too much too quickly, before she really had an understanding of IWU's systems and processes. (Oke Aff., ¶ 5).

Oke met with Lewis and with Rider, both individually and together, on several occasions to try to mediate their differences and clarify their roles. (L.D. 47:6-12; Oke Aff., ¶ 6)  Lewis contends that during one of her meetings with Oke to discuss her role and Rider's role that Oke told her to "step out of the way," which she thought meant Rider was being put in charge and she viewed as a demotion. (Compl., ¶ 14) Oke had no intention of demoting Lewis, but he did think she needed to slow down and take more time to learn IWU's systems and processes before attempting to exert too much authority. (Oke Aff., ¶ 6) Ultimately, the attempts to bridge the gap between Lewis and Rider were unsuccessful, and Rider resigned in frustration effective August 31, 2017. (L.D. 61:22-62:1; Oke Aff., ¶ 6; Pederson Aff., ¶ 4.b.)

### D.   Lewis' Conflict with the Rest of the Instructional Design Team

IWU hired Maggie Collins ("Collins"), who is Hispanic, effective December 16, 2017, as an ID to help fill the void on the team left by Rider's departure. (L.D. 62:6-8; 62:25-63:2; Oke Aff., ¶ 7)  Oke considered Collins to be a "great find," who was ambitious in work ethic, creativity, and well-liked by the other IDs. (Oke Aff., ¶ 7) However, conflict soon developed between Lewis and Collins.  (Oke Aff., ¶ 7) Collins approached Oke in late February 2018,

expressing concern about what she viewed as Lewis' hostile supervisory practices directed at her. (Oke Aff., ¶ 7) Oke asked Collins to do all she could to cooperate with Lewis and honor her in a way that would set an example for the rest of the staff, which Collins said she would do. (Oke Aff., ¶ 7) However, later in March some of the other IDs expressed concern to Oke about how Lewis was treating Collins. (Oke Aff., ¶ 7) They also said that they found Lewis' management style at times dictatorial and at other times confusing. (Oke Aff., ¶ 7) Oke encouraged the IDs to communicate as clearly as possible with Lewis and give her a chance. (Oke Aff., ¶ 7) Over the next few months there were some ups and downs, but it seemed on the surface to Oke that things were at least somewhat improving in the relationship between Lewis and IDs. (Oke Aff., ¶ 7).

In very late July or early August 2018, Oke was talking with ID Jamie Dayton and asked how she felt things were going on the ID team. (Oke Aff., ¶ 8) Dayton told him that Collins and ID Kim Mierau were both job hunting because of how Lewis treated them and that the rest of the ID staff was despondent, believing nothing would be done about Lewis' poor leadership of the team. (Oke Aff., ¶ 8) Dayton recommended that Oke talk to each ID individually to get their perspective. (Oke Aff., ¶ 8) Oke did this, and discovered that all the IDs were very unhappy with Lewis' leadership. (O.D. 31:6-10; Oke Aff., ¶ 8) Common concerns were that Lewis was dictatorial, often confusing in instructions, did not have a good grasp on the computer systems used by the ID team, was incompetent, and that she picked on Collins, including inappropriately bad-mouthing her to other IDs while conducting their annual review sessions. (Oke Aff., ¶ 8) Oke asked the IDs to put their concerns in writing, which they did. (Oke Aff., ¶ 8 and Ex. A) The feedback from the IDs was consistent, and Lewis does not know but admits that Oke probably

believed the IDs' complaints about her. (L.D. 66:12-67:5;  68:10-17;  69:2-10,  17-19; Oke Aff., ¶ 8)  Oke did believe the IDs' complaints about Lewis. (Oke Aff., ¶ 8)

### E.   Lewis Is Removed From Supervision of the Instructional Design Team and Becomes the Director of Support for Research and Learning

Oke had never received the same type of complaints about any other Directors who reported to him.  (Oke Aff., ¶ 8)  It was evident to Oke that the relationship between Lewis and the IDs was irretrievably broken. (Oke Aff., ¶ 9) Oke met with Jill Battishill from Human Resources and with Chancellor Matt Lucas to discuss what should be done. (O.D. 31:18-21; 41:11-13; Oke Aff., ¶ 9) It was agreed that Oke needed to intervene and remove Lewis from leadership of the ID team and restructure her role in a way that would not involve supervising other employees. (O.D. 31:11-32:1;  63:21-64:3;  Oke Aff., ¶ 9) Nevertheless, IWU did not want to terminate Lewis' employment and hoped that over time with some developmental coaching Lewis would eventually be ready again to assume a leadership position.  (Oke Aff., ¶ 9)

Oke met with Lewis on August 6, 2018, to talk with her about the feedback on her leadership received from the IDs and the decision that had been reached. (L.D. 89:9-20;  O.D. 33:3-9 and Ex. 27; Oke Aff., ¶ 10) Lewis said she thought the IDs disliked reporting to her because she thought they did not understand her as an African American. (L.D. 92:16-19)  None of the IDs had ever said anything about Lewis' race to her or Oke. (L.D. 55:1-3; 93:19-24;  Oke Aff., ¶ 10) Oke did not see the issue as having anything to do with race. (O.D. 28:5-13; 38:19-21; Oke Aff., ¶ 10) After the meeting Lewis was sent home and told not to come in the next day. (L.D. 161:1-15;  O.D. 39:6-12)  She thought Oke was planning to have her terminated, but that was not Oke's intention,  he simply wanted her to work from home away from the ID team until her new role could be clarified. (Compl., ¶ 16; L.D. 146:1-7;  L.D. Ex. 27; Oke Aff., ¶ 10)[3].

---

[3]    Collins was subsequently temporarily put in charge of the ID team as Senior ID. (O.D. 51:15-52:12)   After

The same day, August 6, 2018, after she was asked to go home Lewis contacted Diane McDaniel ("McDaniel"), who is an African American woman born in 1953, IWU's Vice President of Diversity and Inclusion & Chief Diversity Officer, to complain that she thought she had been removed from her supervisory position due to her race or sex.[4] (L.D. 36:9-19; 89:18-20; 90:12-13; O.D. 41:14-16; McDaniel Aff., ¶¶ 1-4)  Oke had also independently contacted McDaniel regarding his meeting with Lewis and to request her assistance in addressing Lewis' concerns. (O.D. 39:13-24; Oke Aff., ¶ 11; McDaniel Aff., ¶ 5) McDaniel facilitated a meeting on August 8, 2018, to address Lewis' concerns and provide additional information as to why she had been removed from leadership. (L.D. 90:14-23; O.D. 39:18-24; 42:6-17; McDaniel Aff., ¶ 6) The meeting was attended by Lewis, McDaniel, Oke, Chancellor Lucas, and Executive Director for Human Resources Mark Pederson, who prepared minutes of the discussion. (L.D. 90:14-23; O.D. 39:18-24; 41:17-19; 49:5-10 and Ex. 28; Oke Aff., ¶ 11; Pederson Aff., ¶ 5) After listening to input from everyone McDaniel found no evidence of discrimination, and by the end of the meeting felt that Lewis had acknowledged that. (McDaniel Aff., ¶ 6)

The outcome of the meeting was that Lewis would not supervise the IDs and would work remotely on projects while a new job description was developed for her. (L.D. 102:25-103:9; Oke Aff., ¶ 12)  Lewis was given input into development of her role, and the next day, August 9, 2018, emailed McDaniel with an initial draft position description. (L.D. 103:7-9; L.D. Ex. 10; McDaniel Aff., ¶ 7) Lewis met with Oke and Pederson on September 5, 2018, to further discuss parameters of her job and ideas for edits to an updated draft job description Oke had provided, noting in a follow up email "the final decision regarding my new position should take place within a week." (L.D. 109:18-110:4 and Ex. 11; Oke Aff., ¶ 12)  On September 12, 2018, and

---

Collins later resigned Sandra Metzger took over the ID team with the title Director of Learning and Innovation on April 16, 2019. (O.D. 51:10-14; 52:13-23; C.D. 43:2-4; Pederson Aff., ¶ 4.c.)

[4]      Lewis did not mention age as a basis of her concerns. (McDaniel Aff., ¶ 4)

after consulting with Pederson and Lucas, Oke emailed to Lewis, copying Lucas, Pederson, and McDaniel, the final job description for Lewis' new title as Director of Support for Research and Learning, and Lewis' title officially changed on October 1, 2018. (L.D. 110:10-111:6 and Ex. 12; O.D. 42:24-43:6; 45:24-46:11; Oke Aff., ¶ 12)  Lewis' pay and benefits were never cut at any time during her employment.  (L.D. 160:10-15)

In her new role Lewis worked primarily remotely, but in the office on Mondays and whenever she needed to attend a meeting on campus. (L.D. 116:20-117:4;  O.D. 64:7-17) Because Lewis did not have any subordinates in her new role, and because her job was funded out of the CLI's general budget, the position was not initially assigned an individual budget, but Lewis requested one and Oke granted the request. (L.D. 120:7-121:10;  O.D. 46:25-47:4; 59:24-60:1; Oke Aff., ¶ 13)  Lewis was never denied payment of any expenses she requested, before or after having a designated budget. (L.D. 121:25-122:16)

Meanwhile, the CLI had begun a multi-month transition to a new location on campus, and while Lewis thought all employees but her were issued a key for the new space in fact a number of employees who primarily worked remotely were not issued keys. (L.D. 115:1-12; 115:22-116:2;  Oke Aff., ¶ 14)  In the morning the building was always unlocked or there was someone available to let employees without keys in.  (L.D. 124:19-125:2)  Many IWU employees are not issued keys, especially ones who work remotely much of the time.  (Pederson Aff., ¶ 6)  If an employee who has not been issued a key wants one, the request must be submitted in writing by the employee on a university form, and approval is discretionary with the supervisor.  (Pederson Aff., ¶ 6) Lewis later submitted a written key request and was provided one. (L.D. 127:7-11;  Pederson Aff., ¶ 6 and Ex. A) The new CLI space was open concept, not as large as the previous space, and there were not as many private office spaces. (L.D. 116:5-8;

-8-

O.D. 58:22-59:10; Oke Aff., ¶ 15) Lewis did not have a private office space. (L.D. 116:5-8)
Sandra Metzger, Lewis' successor as Director over the Instructional Design Team, did not have a
private office space either. (Metzger Aff., ¶ 2-3) There was flex office space in the center of the
new CLI suite that was available to be used by Lewis and other employees who mostly worked
remotely. (O.D. 64:18-24)

> **F.     Lewis' Position is Eliminated By The New CLI Executive Director**

On April 1, 2019, Erin Crisp ("Crisp") became the new Executive Director of the CLI,
into which was merged other staff and programs over which Crisp already had supervisory
authority, and at that time Crisp became Lewis' supervisor. (L.D. 117:5-13; O.D. 58:10-17; C.D.
10:16 & errata; 15:15 & errata; 17:3-7; 24:14-21; 44:6-25; 46:13-25; Pederson Aff., ¶ 4.e.; Crisp
Aff., ¶ 2) Crisp planned to reorganize the CLI as part of a larger restructuring of IWU's National
& Global campus. (Crisp Aff., ¶ 3) A couple of months before officially taking over as the new
Executive Director of the CLI, Crisp reviewed the duties and role of each position she would
supervise. (C.D. 22:1-13; Crisp Aff., ¶ 3) Crisp, who had not been involved in the development
of Lewis' new job description, did not think that Lewis' position as Director of Support for
Research and Learning advanced her goals for the CLI or aligned with IWU's strategic plan as
she envisioned them. (C.D. 20:3-12; Crisp Aff., ¶ 3)

On February 13, 2019, Crisp emailed her boss, Chancellor Lucas, to inform him of her
plan to eliminate Lewis' position, but to perhaps create a Research Assistant position she thought
could be of value. (C.D. 30:5-32:2 and Ex. 35; Crisp Aff., ¶ 4) At the time Crisp communicated
her plan she had no knowledge of Lewis' previous allegations of discrimination. (Crisp Aff., ¶ 4)
Lucas suggested that Crisp speak with McDaniel before moving forward with her plan to
eliminate Lewis' position, which Crisp did in late March 2019. (C.D. 36:15-37:21; 45:2-12;
47:1-15 and Ex. 36; Crisp Aff., ¶ 4; McDaniel Aff., ¶ 11) McDaniel encouraged Crisp to delay

implementing her decision to eliminate the role, and instead first to give Lewis an opportunity to demonstrate to Crisp if the role had sufficient value and should be retained, which Crisp agreed to do. (Crisp Aff., ¶ 4; McDaniel Aff., ¶ 12)

By mid-June Crisp still did not feel that Lewis' role was needed and decided to follow through with her original decision from February to eliminate Lewis' position. (Crisp Aff., ¶ 5) Crisp did still think, however, that a Research Assistant position could be of value. (Crisp Aff., ¶ 5) On June 17, 2019, Crisp therefore offered Lewis the options of either accepting the new Research Assistant position with an effective date of July 15, 2019, or remaining in her current role while looking for another position on campus and if no other position was obtained ending employment with IWU at the end of August. (L.D. 147:7-148:13 and Ex. 18; C.D. 40:16-41:14 and Ex. 37; Crisp Aff., ¶ 5) Lewis elected to remain in her current position. (L.D. 150:1-11 and Ex. 19) Lewis did not find another position with IWU, and her employment therefore ended on August 31, 2019. (L.D. 150:12-14 and Ex. 19; Crisp Aff., ¶ 5)

IWU eliminated and never hired a replacement for the Director of Support for Research and Learning position vacated by Lewis. (C.D. 45:24-46:1; Crisp Aff., ¶ 6) Some of the main duties Lewis had performed simply ceased to be done, as Crisp did not find them of importance; other duties were not distributed to anyone in particular and were instead just absorbed by the entire staff of the CLI as a whole; a few duties were divided between Crisp and the other CLI Directors. (C.D. 23:1-24:10; 29:8-18 and Ex. 34; Crisp Aff., ¶ 6)

G.   **Lewis' EEOC Charge and Lawsuit**

Lewis filed an EEOC Charge against IWU on July 8, 2019. (L.D. 14:17-15:5 and Ex. 2) The EEOC dismissed Lewis' Charge with a no-cause finding on July 29, 2019. (L.D. 15:6-17 and Ex. 3) Lewis subsequently filed this lawsuit on October 24, 2019.

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record shows "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c). The moving party need not positively disprove the opponent's case; rather, it may prevail by establishing the lack of evidentiary support for that case. *See Celotex*, 477 U.S. at 325. A party must present more than mere speculation or conjecture to defeat a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 637 (7th Cir. 2001). Neither the "mere existence of *some* alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247-48, nor the existence of some "metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). And "[a] party needs more than a scintilla of evidence, however, to defeat summary judgment. In summary judgment cases, the non-movant must show that a discriminatory reason *more likely* motivated the employer's decision or that its proffered explanations are *unworthy* of credence." *Senner v. Northcentral Technical Coll.*, 113 F.3d 750, 757-758 (7th Cir. 1997) (citation and marks omitted).

### IV.    Argument

Lewis' Complaint asserts that she was unlawfully demoted, treated differently/less favorably in miscellaneous ways, and ultimately "constructively discharged." She claims these things happened because of her race (Title VII and 42 U.S.C. § 1981), her sex (Title VII), and her age (ADEA). She also asserts some of these things occurred in retaliation for engaging in protected activity. None of these claims can survive summary judgment, for a litany of reasons.

In *Jones v. Parkview Hospital, Inc.*, 2020 WL 6291462, at * 10 (N.D. Ind. Oct. 26, 2020)

(Lee, J.), this Court stated:

> Under the *McDonnell Douglas* burden-shifting method, Jones can establish a *prima facie* case of race or sex discrimination under Title VII (or race discrimination under § 1981) by presenting evidence that she is a member of a protected class, that she was meeting Parkview's legitimate expectations, that she suffered an adverse employment action, and that similarly situated individuals not in her protected class were treated more favorably. *Preston v. Forge Indus. Staffing, Inc.*, 449 F.Supp.3d 845, 851 (N.D. Ind. 2020) (citing *Farr v. St. Francis Hosp. and Health Ctrs.*, 570 F.3d 829, 833 (7th Cir. 2009)). "If a plaintiff can establish these four elements, the defendant has an opportunity to articulate a legitimate, nondiscriminatory reason for its action. If the defendant does so, the burden shifts back to the plaintiff and must offer evidence showing that the defendant's excuse is pretextual." *Id.* "This analysis is the same whether a court is analyzing a claim under Title VII or § 1981." *Id.* (citing *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007)). "At the end of the day, the Court must determine whether a reasonable juror could conclude that Plaintiff would have kept his job if he were a member of a different class, and everything else stayed the same." *Id.* (citing *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 763 (7th Cir. 2016)).
>
> The standard of review is the same for Jones' claim under the ADEA. In order to survive summary judgment, Jones must show that: 1) she was a member of the protected class; 2) she was meeting Parkview's legitimate expectations; 3) she suffered an adverse employment action; and 4) similarly situated younger employees were treated more favorably. *Cook v. ArcelorMittal USA LLC*, 2020 WL 4284708, at *4 (N.D. Ind. July 27, 2020) (citing *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 463 (7th Cir. 2014)). Under the ADEA, Jones "'retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action[.]' " *Id.* (quoting *Gross v. FVL Fin. Servs.*, Inc., 557 U.S. 167, 177 (2009)).

Similarly, retaliation claims also follow this burden-shifting framework:

> To succeed on a Title VII retaliation claim, a plaintiff "must produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) the [employer] took a materially adverse action against her; and (3) there existed a but-for causal connection between the two." *Burton*, 851 F.3d at 695; *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). When the plaintiff establishes a prima facie case of retaliation, an employer may produce evidence which, if taken as true, would permit the conclusion that it had a legitimate non-discriminatory reason for taking the adverse employment action. *See Lord*, 839 F.3d at 564. If the employer meets this burden, the

QB\66889315.2

> plaintiff, to avoid summary judgment, then must produce evidence
> that would permit a trier of fact to establish, by a preponderance of
> the evidence, that the legitimate reasons offered by the employer
> were not its true reasons but were a pretext for discrimination.
> *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008). In
> determining whether the employer's reason can be characterized as
> pretextual, we do not evaluate whether the employer's proffered
> justification was accurate or even whether it was unfair. Our sole
> focus is on whether the employer's stated reason can be
> characterized as a falsehood rather than an honestly held belief.
> *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012);
> *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir.
> 2011).

*Robertson v. Department of Health Services*, 949 F.3d 371, 378 (7th Cir. 2020).

### A.   Lewis Failed to Exhaust Required Title VII and ADEA Administrative Remedies Timely with Respect to the 2017 "Demotion" and August 2018 Removal of Supervisory Duties

Even before reaching the substance, two of Lewis' claims under Title VII and the

ADEA—related to her 2017 "demotion" and the August 2018 removal of her supervisory

duties—fail because they are time-barred. In Indiana, a plaintiff must first file a Charge with the

EEOC within 180 days of challenged adverse action for ADEA claims, and within 300 days for

Title VII claims. 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(1)(A); *Daugherity v. Traylor*

*Bros.*, 970 F.2d 348, 350 n.2 (7th Cir. 1992) ("Indiana is not a 'deferral state' for the purposes of

the ADEA," so the 180-day statute of limitations applies); *Kennedy v. Reid Hosp. & Health Care*

*Servs., Inc.*, 279 F. Supp. 3d 819, 832 (S.D. Ind. 2017) (300-day statute of limitations applies for

Title VII claims). "Failure to file a timely charge with the EEOC precludes a subsequent lawsuit

under Title VII," *Beamon v. Marshall & Ilsley Trust Company*, 411 F.3d 854, 860 (7th Cir.

2005) (citation omitted), or the ADEA, *Ajayi v. Aramark Business Services., Inc.*, 336 F.3d 520,

527 (7th Cir. 2003). This Court recently applied these timeliness principles to both Title VII and

ADEA claims, finding them time-barred, in *Jones*, 2020 WL 6291462, at *11 (Lee, J.)

Here, the Complaint alleges that Lewis suffered a first "demotion" when Oke purportedly

told her to "step back" and let Rider lead. (Compl., ¶ 14) Rider resigned his employment with

IWU on August 31, 2017, so this comment had to be made sometime before that date. (L.D. 61:22-62:1; Oke Aff., ¶ 6; Pederson Aff., ¶ 4.b.) Lewis, however, did not file her only EEOC Charge until July 8, 2019, about two years later. (L.D. 14:17-15:5 and Ex. 2) Thus, her ADEA and Title VII claims with respect to the 2017 "demotion" are time-barred.

Similarly, Lewis' ADEA and Title VII claims related to the August 2018 removal of her supervisory duties are also time-barred. Oke met with Lewis on August 6, 2018, to inform her that based on the extremely negative feedback he had received from the entire team of IDs she would no longer be supervising them. (L.D. 89:9-20; O.D. 33:3-9 and Ex. 27; Oke Aff., ¶ 10) Further discussion was had with Lewis on August 8, 2018, in the meeting attended by Lewis, Oke, Lucas, McDaniel and Pederson concerning the reasons for this action and IWU's intention to place her in a non-supervisory role. (L.D. 90:14-23; O.D. 39:18-24; 41:17-19; 42:6-17; 49:5-10 and Ex. 28; McDaniel Aff., ¶ 6; Oke Aff., ¶ 11; Pederson Aff., ¶ 5) Lewis understood that she would no longer be leading the ID team, and indeed tendered her first draft of a proposed job description for a new position the very next day, on August 9, 2018. (L.D. 103:7-9; L.D. Ex. 10; McDaniel Aff., ¶ 7) But Lewis did not file her EEOC Charge until 333 days later, on July 8, 2019, again making her Title VII and ADEA claims untimely. (L.D. 14:17-15:5 and Ex. 2)

**B.    Lewis Cannot Establish A *Prima Face* Case or Show Pretext with Respect to Her Section 1981 Claims Related to the 2017 "Demotion" and August 2018 Removal of Supervisory Duties**

Claims under § 1981 have a longer statute of limitations and no administrative exhaustion requirement. Nevertheless, Lewis' § 1981 discrimination and retaliation claims related to the 2017 "demotion" and the August 2018 removal of her supervisory duties fail substantively, both because she cannot establish a *prima facie* case and because she cannot establish pretext.[5]

_____

[5]    Even if they were not time-barred, Lewis' Title VII and ADEA claims related to these same actions would fail for the same reasons because claims under both statutes are analyzed using the same framework as claims under

-14-

### 1.    There Was No Materially Adverse Employment Action

To support a discrimination or retaliation claim, an alleged employment action must be "materially adverse," meaning "one which visits upon a plaintiff a significant change in employment status." *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016). "Such changes can involve the employee's current wealth, his career prospects, or changes to work conditions that include humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in the workplace." *Id.* From the get-go there was friction between Lewis and Senior ID Rider. Oke met with Lewis and with Rider, both individually and together, on several occasions to try to mediate their differences and clarify their roles. (L.D. 47:6-12; Oke Aff., ¶ 6) Lewis contends that during one of her meetings with Oke to discuss her role and Rider's role that Oke told her to "step out of the way," which she thought meant Rider was being put in charge and she viewed as a demotion. (Compl., ¶ 14) Oke had no intention of demoting Lewis, but thought she was trying to exert too much control too soon without really fully understanding IWU's systems and thought it would help her and the relationship with Rider if she were to slow down and take more time to learn IWU's systems and processes before attempting to exert too much authority. (Oke Aff., ¶ 6) In any case, Lewis specifically alleges in the Complaint that she declined Oke's suggestion and continued to perform her same duties as before, so there was no change in her duties. (Compl., ¶ 14) Moreover, there was no change to Lewis' pay, benefits, or title at that time. (L.D. 160:10-15) Thus, there was no materially adverse employment action.

The August 2018 removal of Lewis' supervision of the ID team was not a "materially adverse employment action" either. Lewis retained the same pay and benefits. (L.D. 160:10-15) She also remained a Director, with her title changing from Director of Instructional Design to Director of Support for Research and Learning. *Place v. Abbott Labs.*, 215 F.3d 803, 810 (7th

§ 1981, *supra*.

Cir. 2000) (finding plaintiff's transfer, in which she retained same title, pay, and benefits, but lost supervisory responsibilities, was not an adverse employment action).

> **2.      Lewis Cannot Show Similarly Situated Individuals Not in her Protected Class Were Treated More Favorably**

To be "similarly situated," the individuals must be "directly comparable" in all material respects. *Dear v. Shinseki,* 578 F.3d 605, 610 (7th Cir. 2009). This means, for example, an individual who held the same job description, was subject to the same standards of conduct, and reported to the same decisionmaker as Lewis. *Id*. And with respect to any such individual, Lewis must demonstrate he or she "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Gates v. Caterpillar, Inc*., 513 F.3d 680, 690 (7th Cir. 2008). "Although precise equivalence is not required, a plaintiff still needs to show that a comparator employee was treated more favorably by the same decisionmaker, even though they were both subject to the same standards of conduct and engaged in similar, but not necessarily identical, conduct." *Zayas v. Rockford Mem. Hosp.,* 740 F.3d 1154, 1158 (7th Cir. 2014) (internal quotations and citation omitted). Thus, Lewis must point to another Director who reported to Oke and who was the subject of serious complaints from multiple subordinates (indeed, in Lewis' case *all* of her subordinates) about her managerial deficiencies and dictatorial leadership. This Lewis cannot do, as Oke did not receive the same type of complaints about any other Directors. (Oke Aff., ¶ 8)

> **3.      Oke Acted for Legitimate Reasons, Which Lewis Cannot Show to be Pretextual**

Finally, even if she could establish a *prima facie* case of discrimination or retaliation (which she cannot), in both 2017 and again in August 2018 Oke acted for legitimate reasons, which Lewis cannot show to be pretext. In 2017, Rider expressed ongoing frustration (and eventually resigned) because Rider told Oke that he often found Lewis' instructions confusing

and that no matter what he did it seemed there was no way to please Lewis. (L.D. 46:23-47:2; Oke Aff., ¶ 5)  In late July/early August 2018, <u>all</u> of the remaining IDs complained that Lewis was dictatorial, often confusing in her instructions, did not have a good grasp on the computer systems used by the ID team, was incompetent, and that she picked on Collins.  (Oke Aff., ¶ 8) Oke learned things were so bad that two of the IDs, Maggie Collins and Kim Mierau, were both job hunting because of how Lewis treated them and that the rest of the ID staff was despondent, believing nothing would be done about Lewis' poor leadership of the team. (Oke Aff., ¶ 8)  Oke asked the IDs to put their concerns in writing, which they did. (Oke Aff., ¶ 8 and Ex. A)  The comments from each of the IDs show just how seriously dysfunctional each of them found the Instructional Design team as a result of Lewis' poor management and dictatorial leadership.[6]

It was on the basis of these serious complaints by her subordinates, and after consulting HR, that Oke decided Lewis had to be removed from supervisory duties.  (Oke Aff., ¶ 9)  Of course, Lewis disputes the accuracy of the complaints the IDs made about her. That, however, is legally irrelevant to the pretext analysis.  *Skiba v. Illinois Central Railroad Co.*, 884 F.3d 708, 724 (7th Cir. 2018) ("The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain [its action]"); *Robertson v. Department of Health Services*, 949 F.3d at 378 ("In determining whether the employer's reason can be characterized as pretextual, we do not evaluate whether the employer's proffered justification was accurate or even whether it was unfair. Our sole focus is

---

[6]     Lewis admits that neither Rider nor any of the other IDs ever said anything about her race to her, nor did any of them mention her race to Oke. (L.D. 52:16-25; 54:18-20; 55:1-3; 93:19-24; Oke Aff., ¶¶ 5, 10)  Yet, she assumes that the source of their discontent with her must have been racial in nature. This sort of speculation is insufficient to defeat summary judgment. *Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928, 931-32 (7th Cir. 1995) ("Such speculation does not meet a party's burden of producing some defense to a summary judgment motion . . . Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.") (citations omitted); *Uhl v. Zalk Josephs Fabricators*, 121 F.3d 1133, 1137 (7th Cir. 1997) ("Facts, not an employee's perceptions and feelings, are required to support a discrimination claim.").

on whether the employer's stated reason can be characterized as a falsehood rather than an honestly held belief.") (internal citations omitted); *Tyler v. Trs. of Purdue Univ.*, 834 F. Supp. 2d 830, 840 (N.D. Ind. 2011) (courts do "not [to] sit as a kind of 'super-personnel department,' weighing the wisdom of a company's employment decisions; rather [courts are] concerned only with whether the employer's proffered explanation was honest."). The extremely negative feedback about Lewis from the IDs was consistent, and Lewis admits that Oke probably believed the IDs' complaints. (L.D. 66:12-67:5; 68:10-17; 69:2-10, 17-19) Oke in fact did believe the IDs' complaints about Lewis. (Oke Aff., ¶ 8) Based on her admission, Lewis is unable to dispute the honesty of Oke's belief in the reason for his actions, so she is unable to demonstrate pretext.

Moreover, Lewis' § 1981 claims are subject to a higher "but for" standard of causation, in which she must show race was not merely a motivating factor but the *determinative* factor in IWU's actions. *Comcast Corporation v. National Association of African American-Owned Media*, 140 S.Ct. 1009, 1019 (2020) ("To prevail [under § 1981], a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right."); *Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1262–1263 (7th Cir. 1990) ("to be actionable [under § 1981], racial prejudice must be a but-for cause ... of the refusal to transact."); *Apuri v. Parkview Health Sys.*, No. 1:16-CV-363-TLS, 2019 U.S. Dist. LEXIS 51533, at *6 (N.D. Ind. Mar. 27, 2019) ("Section 1981 requires a 'but for' causation analysis.").[7]

This is not something Lewis can do. When Lewis was hired there were three finalists for the position, all of whom were interviewed in person by Oke and a hiring committee on campus.

---

[7]      Even if they were not otherwise time-barred, Lewis' Title VII retaliation, ADEA age discrimination, and ADEA retaliation claims would also be subject to the same elevated "but for" causation standard. *Univ of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) (Title VII retaliation); *Reynolds v. Tangherlini*, 737 F.3d 1093, 1104 (7th Cir. 2013) (same); *Barton v. Zimmer, Inc.*, 662 F.3d 448, 455 (7th Cir. 2011) (ADEA retaliation); *Jones*, 2020 WL 6291462, at *10 (Lee, J.) (age discrimination) (quoting *Gross v. FVL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)); *Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 604 (7th Cir. 2012) (same).

Two of the finalists were white, while Lewis was black. Oke selected Lewis as his preferred candidate over the two white finalists. (L.D. 56:9-13; O.D. 17:1-6; Oke Aff., ¶ 4) It makes no sense that Oke would hire Lewis, knowing she was black, only to turn around and "demote" her within a few months or remove her supervisory duties less than two years later based on race. *See EEOC v. Our Lady of the Resurrection Med. Ctr.*, 77 F.3d 145, 152 (7th Cir. 1996).[8] Indeed, when Oke subsequently moved to an Assistant Vice President role one of his first selections for his new team was a 57 year old African American woman. (Oke Aff., ¶ 18)

**C.**     **Lewis' Claims That She Was Treated Differently and Less Favorably in Miscellaneous Ways for Discriminatory or Retaliatory Reasons Fail**

Next, Lewis claims that she was discriminated or retaliated against by being treated differently and less favorably in several miscellaneous ways. Specifically, Lewis complains that after she became the Director of Support for Research and Learning and when the CLI moved to its new office space in the fall of 2018 she was not initially given an individual budget, was not initially given a key to the new building, and that after the move she did not have a private office space. (Compl., ¶¶ 24-26) These claims fail, both because they do not constitute a materially adverse employment actions, and because IWU acted for legitimate reasons.

**1.**     **None of These Things Were Materially Adverse Employment Actions**

Not initially having an individual budget in her new role as Director of Support for Research and Learning is not a materially adverse employment action. *Tyler v. Ispat Inland Inc.*, 245 F.3d 969, 972 (7th Cir. 2001) ("even the denial of a monetary perk, such as a bonus or reimbursement of certain expenses, does not constitute an adverse employment action if it is wholly within the employer's discretion to grant or deny and is not a component of the

---

[8]     It also make little sense to suggest age would have been a factor, let alone a but-for cause, of Oke's action given that Oke is only three years younger than Lewis. *See, e.g., Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 572 (7th Cir. 1998); *Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1147 (7th Cir. 1994).

employee's salary."). Lewis was never denied payment of any expenses she requested, before or after having a designated budget. (L.D. 121:25-122:16)   And after Lewis requested it she was given an individual budget. (L.D. 120:7-121:10;  O.D. 46:25-47:4;  59:24-60:1;  Oke Aff., ¶ 13)

Nor is not initially being issued a key to the CLI's new building a materially adverse employment action. *Villarruel v. Gary Cmty. Sch. Corp.*, 28 F. App'x 564, 569 (7th Cir. 2002) (plaintiff's complaint that supervisor took away key to computer room and work area did not constitute adverse employment action but, "at most . . . constituted a minor inconvenience, as opposed to a material change in her employment status."). In the morning the building was always unlocked or there was someone available to let in employees without keys. (L.D. 124:19-125:2)   If an employee who has not been issued a key wanted one, university policy required that the request must be submitted in writing by the employee on a university form, and approval was discretionary with the supervisor. (Pederson Aff., ¶ 6) Lewis later submitted such a written key request and was provided with a key. (L.D. 127:7-11;  Pederson Aff., ¶ 6 and Ex. A)

Finally, not having a private office in the CLI's new, smaller space is not a materially adverse employment action either. *Place,* 215 F.3d at 810 (loss of cubicle, without any showing that new working quarters—though not as nice—were shabby or unpleasant, is "too trivial to amount to an adverse employment action"). After August 6, 2018, Lewis mostly worked remotely, and in the CLI's new smaller location there was shared office space available for those occasions when Lewis was on campus. (O.D. 64:18-24)

In short, none of the miscellaneous things about which Lewis complains amount to a materially adverse employment action. *Testerman v. EDS Tech. Prods. Corp.*, 98 F.3d 297, 306 (7th Cir. 1996) (". . . [a]dding together a string of nothings still yields nothing.").

-20-

**2.    There Were Legitimate Reasons for Each Item About Which Lewis Complains, Which She Cannot Show to be Pretextual**

In any case, there were entirely legitimate reasons for each of these miscellaneous things about which Lewis complains, which she cannot show to be pretextual. Her new position as Director of Support for Research and Learning was funded out of the CLI's general budget and Lewis had no subordinates, so there was no reason she needed an individual budget. (L.D. 120:7-121:10; O.D. 46:25-47:4; 59:24-60:1; Oke Aff., ¶ 13) And after she requested one Oke granted it. (L.D. 120:7-121:10; Oke Aff., ¶ 13) As noted above, Lewis was never denied funding for anything, before or after being provided an individual budget. (L.D. 121:25-122:16)

Similarly, there was legitimate reason for Lewis not initially being assigned a key to the CLI's new office location. In her new role Lewis worked primarily remotely. (L.D. 116:20-117:4) The CLI had begun a multi-month transition to a new location on campus and, while Lewis mistakenly thought all employees but her were issued a key for the new space, in a number of employees who primarily worked remotely were not issued keys. (L.D. 115:1-12; 115:22-116:2; Oke Aff., ¶ 14) Indeed, many IWU employees across campus are not issued keys, especially ones who often work remotely. (Pederson Aff., ¶ 6) University employees who do not have a key but want one must submit that request in writing on a university form. Lewis submitted only one such written request, which was approved. (Pederson Aff., ¶ 6 and Ex. A)

Finally, not being assigned a private office after the CLI's move was also legitimate. The new space was open concept, not as large as the previous space, and there were not as many private offices. (L.D. 116:5-8; Oke Aff., ¶ 15) Lewis, who mostly worked remotely, did not have a private office space. (L.D. 116:5-8) Neither did Sandra Metzger, who is a white woman and was Lewis' successor as Director over the Instructional Design Team. (Metzger Aff., ¶¶ 2-3)

-21-

### D.   Lewis' Second Demotion/Constructive Discharge Claim Fails

Lewis' final claim is that she was discriminated or retaliated against when her position as Director of Support for Research and Learning was eliminated and she was given the choice in June 2019 between accepting a new, to-be-created Research Assistant job or having her employment terminate at the end of August 2019. Lewis' Complaint alleges that this constituted a "second demotion" and "constructive discharge." (Compl., ¶¶ 30, 35)

This claim fails for several reasons. First, the elimination of her position could not have been in retaliation for Lewis' previous complaint of discrimination, because Crisp was unaware of that complaint at the time she made the decision to eliminate Lewis' position. Lewis therefore cannot establish the necessary "but for" causal link element of the *prima facie* case of retaliation under Title VII, § 1981, or the ADEA. Moreover, Lewis cannot establish the fourth element of a *prima facie* case of discrimination because the position did not remain open after her employment ended. Finally, even if she could establish a *prima facie* case of retaliation or discrimination, Lewis cannot show the legitimate reason for IWU's action to be pretextual.

### 1.   Lewis Cannot Show the Required "But For" Causal Link to Support a Retaliation Claim

"Failure to satisfy any one element of the *prima facie* case is fatal to an employee's retaliation claim." *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006) (citation and marks omitted). Lewis cannot establish the third element of a prima facie case of retaliation, a "but for" causal link between her complaint of discrimination in August 2018 and the subsequent decision by Crisp to eliminate Lewis' position as Director of Support for Research and Learning. *Nassar*, 570 U.S. at 352; *Reynolds*, 737 F.3d at 1104; *Barton,* 662 F.3d at 455; *Welch v. Eli Lilly & Co.*, No. 1:11-cv-00891-LJM-TAB, 2013 U.S. Dist. LEXIS 153246, at *20

-22-

(S.D. Ind. Oct. 24, 2013); *Jones v. A.W. Holdings, LLC*, No. 1:09-cv-284-WCL, 2011 U.S. Dist. LEXIS 11815, at *31 (N.D. Ind. Feb. 7, 2011).

"A causal link requires more than the mere fact that an employer's action happens after an employee's protected activity." *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016) (citation omitted). Lewis cannot make a but-for causal showing here for two reasons, either of which independently dooms her retaliation claim. First, there was a more than six-month time gap between Lewis' complaint of discrimination in early August, 2018, and Crisp's email to Lucas on February 13, 2019 that communicated Crisp's decision to eliminate Lewis' position. Such a lengthy time gap undercuts the ability to demonstrate a causal link. *See, e.g, Harper v. C.R. England, Inc.*, 687 F.3d 297, 308 (7th Cir. 2012) (five-month gap between protected activity and adverse action too long to support inference of causation).

Second, and even more importantly, Crisp had no knowledge of Lewis' previous complaint of discrimination when she made the decision to eliminate Lewis' job. (Crisp. Aff., 4) It is not possible for there to be a causal link between protected activity and adverse action where the decision maker had no knowledge of the protected activity at the time the decision was made. *Stephens v. Erickson*, 569 F.3d 779, 788 (7th Cir. 2009) ("Clearly, a superior cannot retaliate against an employee for a protected activity about which he has no knowledge.").

## 2. Lewis Cannot Establish the Fourth Element of A Prima Facie Case of Race, Sex or Age Discrimination

Lewis also cannot establish the fourth element of a *prima facie* case of race, sex, or age discrimination with respect to Crisp's decision to eliminate her position as Director of Support for Research and Learning. Specifically, in the context of a job elimination the fourth element of a discrimination *prima facie* case requires the plaintiff to show "there was a similarly situated person not in his protected class who was treated better than he was." *Bio v. Inventiv Health*

*Clinical, LLC*, 793 F. App'x 450, 452 (7th Cir. 2020). This Lewis cannot do. There is no evidence that any other Director whose position insufficiently advanced Crisp's goals of the CLI or was misaligned with IWU's strategic plan as envisioned by Crisp, kept his or her job.

### 3. Lewis Was Terminated for Legitimate Reasons, Which She Cannot Show to be Pretextual

Even if Lewis could establish a *prima facie* case with respect to the elimination of her position as Director of Support for Research and Learning, her claims would still fail because the decisionmaker, Crisp, acted for legitimate reasons that Lewis cannot show to be pretextual. Once again, the same legal analysis set out in Section IV.B.3 above applies equally here.

Crisp was not involved in the decision to create Lewis' Director of Support for Research and Learning position. (C.D. 20:3-12; Crisp Aff., ¶ 3) In preparation for assuming leadership of the CLI, Crisp reviewed all of the positions in the CLI to understand what they did. (C.D. 22:1-13; Crisp Aff., ¶ 3) With respect to Lewis' position, Crisp did not feel that the job aligned with her vision of IWU's strategic plan and her plans for restructuring the CLI. (C.D. 20:3-12; Crisp Aff., ¶ 3) Crisp decided she wanted to eliminate the role, which she communicated in an email to Chancellor Lucas in an email on February 13, 2019. (C.D. 30:5-32:2 and Ex. 35; Crisp Aff., ¶ 4) Lucas recommended that Crisp consult with McDaniel before moving forward, which she did. (C.D. 36:15-37:21; 45:2-12; 47:1-15 and Ex. 36; Crisp Aff., ¶ 4; McDaniel Aff., ¶ 11) McDaniel encouraged Crisp to delay implementation of her decision to give Lewis a chance to demonstrate to Crisp whether the position warranted retaining, which Crisp agreed to do. (Crisp Aff., ¶ 4; McDaniel Aff., ¶ 12) By mid-June Crisp's view had not changed, so she moved forward with her original decision to eliminate the role, notifying Lewis on June 17, 2019. (Crisp Aff., ¶ 5) Crisp did think that a Research Assistant position could be of value (which she had also mentioned to Lucas in her February 13 email). (Crisp Aff., ¶ 5) Crisp offered this

possible new role to Lewis, but Lewis declined the offer and her employment therefore ended on August 31, 2019. (L.D. 147:7-148:13 and Ex. 18; C.D. 40:16-41:14 and Ex. 37; Crisp Aff., ¶ 5) Crisp did not hire anyone to replace Lewis. (C.D. 45:24-46:1; Crisp Aff., ¶ 6) Some of the main duties Lewis had performed simply ceased to be done, as Crisp did not find them of importance. Other duties were not distributed to anyone in particular, and were just absorbed by the entire staff of the CLI as a whole. (C.D. 23:1-24:10; 29:8-18 and Ex. 34; Crisp Aff., ¶ 6)

Lewis may disagree and think her role should have been retained. The question, however, is not whether Crisp was "right" or "wrong" in her decision to eliminate Lewis' role, but whether Crisp's reason for doing so was honest. *Skiba*, 884 F.3d at 724; *Robertson*, 949 F.3d at 378; *Tyler*, 834 F. Supp. 2d at 840. There is no evidence to dispute the honesty of Crisp's reasoning, so Lewis' claims as to elimination of this position cannot survive.

## V.    CONCLUSION

For all these reasons, IWU respectfully requests that the Court grant summary judgment in its favor on all claims in this action.

Respectfully submitted,

QUARLES & BRADY LLP

By: /s/Edward E. Hollis
Edward E. Hollis (#19402-49)
Leeann P. Simpkins (#30799-29)
135 N. Pennsylvania Street, Suite 2400
Indianapolis, Indiana 46204
Phone (317) 957-5000
Fax: (317) 957-5010
Email:   Edward.Hollis@quarles.com
         Leeann.Simpins@quarles.com

*Attorneys for Defendant*

-25-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 25, 2021, a copy of the foregoing *Defendant's Motion for Summary Judgment* was filed electronically.   Notice of this filing  will  be sent to the following  parties by operation of the Court's electronic filing  system.   Parties may access this filing  through  the CM/ECF system:

> Amber K. Boyd
> amber@amberboydlaw.com
> Sarah E. Larimer
> sarah@amberboydlaw.com
> 8510 Evergreen Avenue
> Indianapolis,  IN 46240

> /s/ Edward E. Hollis_____

QB\66889315.2