UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| EMILY LEWIS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO.  1:19cv451 |
| | ) | |
| INDIANA WESLEYAN UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

<u>AMENDED OPINION AND ORDER</u>

This matter is before the Court on a Motion for Summary Judgment, filed by the defendant, Indiana Wesleyan University ("IWU") on February 25, 2021.  Plaintiff, Dr. Emily Lewis ("Dr. Lewis), filed her response on May 6, 2021 to which IWU replied on June 1, 2021.[1]

On June 25, 2021, this Court granted IWU's motion in its entirety.  Dr. Lewis timely appealed this Court's Opinion to the Seventh Circuit Court of Appeals.  On June 10, 2022, the Seventh Circuit entered an Opinion in which it affirmed the vast majority of this Court's rulings, but vacated and remanded this Court's Opinion with respect to Dr. Lewis's discriminatory termination claim that was based on race.  The Seventh Circuit held that it was not "sure that the district court adequately considered the merits of that claim." *Lewis v. Indiana Wesleyan University* (7th Cir.  June 10, 2022, slip op at 8).  This Amended Opinion and Order more fully addresses Plaintiff's race discrimination claim.

---

[1]  On June 8, 2021, Lewis filed a motion for leave to file a sur-reply, and filed her sur-reply on this same date.  On June 11, 2021, IWU filed an objection to the motion for leave to file sur-reply. As the sur-reply doesn't change the outcome of this case, the motion to for leave to file will be granted.

<u>Standard of Review</u>

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010).

Under Rule 56, the movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id*. (citation and internal quotation marks omitted). The nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [its] favor." *Id*. (citation and internal quotation marks omitted). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). "[S]peculation and conjecture" also cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only

those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259

F.3d 833, 837 (7th Cir. 2001) (citation omitted). A party opposing a properly supported summary

judgment motion may not rely merely on allegations or denials in his or her own pleading, but

rather must "marshal and present the court with the evidence she contends will prove her case."

*Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). If the nonmoving party

does not establish the existence of an essential element on which that party bears the burden of

proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir.

2006). Summary judgment "is the put up or shut up moment in a lawsuit ...." *Springer v.

Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

Discussion

Dr. Lewis, a 60-year old Black woman, was formerly employed by IWU.  In her

Complaint she asserts that she was unlawfully demoted, treated differently and/or less favorably

in various ways, and ultimately constructively discharged because of her age, race and sex.  She

also alleges claims of retaliation.

The relevant facts, as alleged by Dr. Lewis, are as follows.[2]  In 2017, Dr. Lewis began

working at IWU as the Director of Instructional Design. (Crisp Dep. 13:19-14:07). In her role,

she reported to the Executive Director of the Center for Learning and Innovation ("Executive

Director"), a role which was held first by Lorne Oke ("Oke") and later by Erin Crisp ("Crisp").

(Lewis Dep. 41:18-41:22; Crisp Dep. 17:08-17:09). Dr. Lewis worked as the Director of

Instructional Design from 2017-2019. (Oke Dep. 11:01-11:03). Dr. Lewis was responsible for

---

[2]  The Court will also discuss IWU's uncontested factual allegations and evidence where
appropriate.

3

overseeing a team of instructional designers ("IDs") and guiding the curriculum development process for IWU's academic courses.  (Lewis Dep. 43:25-44:5).

Oke served as the Executive Director for 10 years, from 2009 to 2019. (Oke Dep. 8:8-8:21, 10:13-10:14). In his position as Executive Director, he oversaw the intersection between academics and instructional design and technology by working across different environments of the school, and various offices to develop and foster innovation in and around the curriculum. (Oke Dep. 9:03-9:13). In 2018-19, Oke had three directors who worked under him, the Director of Instructional Design, the Director of Faculty Enrichment, and Dr. Lewis who was the Director of Research and Instructional Design Team. (Oke Dep. 9:13-9:25). All of the directors on his staff were Caucasian men except for Dr. Lewis. (Oke Dep. 11:11-11:21).

Crisp worked at IWU from 2015 to August of 2020. (Crisp Dep. 8:24-9:03). She was originally hired as an Instructional Designer, and two years later was promoted to the position of Director of Instructional Design. (Crisp Dep. 9:04-9:20). In April 2018, Crisp replaced Oke as the Executive Director of Center of Learning and Innovation. (Crisp Dep. 10:04-10:24). In the Spring of 2019, two departments merged and Crisp's position changed to Associate Vice President for Innovation. (Crisp Dep. 10:15-10:24).

Crisp had no more than five interactions with Dr. Lewis, and Crisp does not remember informally meeting with Dr. Lewis. (Crisp Dep. 19:02-20:02).

As the Director of Instructional Design, Dr. Lewis supervised five IDs. All five IDs were Caucasian. (Lewis Dep 45:24-46:1). Nick Rider ("Rider"), a Caucasian male, served as one of the IDs. (Lewis Dep. 45:24-46:07).

Dr. Lewis performed her job well and was a good researcher. (Oke Dep. 57:25-58:11;

20:04-20:08). Dr. Lewis had a long work history which led her to be comfortable with a wide variety of topics that she was knowledgeable about, and provide IWU with a varied and positive perspective. (Oke Dep. 19:17-19:23). One fellow staff member requested to work with Dr. Lewis because of her professionalism and expertise. (Exhibit L: Rice Requesting Assistance from Dr. Lewis). However, IWU contends that Dr. Lewis came into severe conflict with all of the ID team members who reported to her. (Oke Aff. ¶5).  According to Oke, common concerns were that Lewis was dictatorial, often confusing in instructions, and was incompetent. (Oke Aff. ¶ 8).  Oke asked the IDs to put their concerns in writing, which they did. (Oke Aff. ¶ 8 and Ex. A.) Oke believed that Dr. Lewis attempted to control too much, too quickly. (Oke Aff. ¶5).  Dr. Lewis does not dispute that she had conflicts with her team members and that they complained to Oke about her management style. (Lewis Dep. 35:7-20; Oke Aff.  ¶¶ 4-8).

Dr. Lewis claims that she had good performance reviews.  Oke did praise some of her skills, but also noted that perhaps Dr. Lewis didn't fit in with the "Church higher-education world" and that her and her team struggled with their working relationships.   Some excerpts from the Performance Reviews are as follows:

 "Emily is a very competent person in the field of curriculum development and instructional design.  She has exhibited a high level of engagement in her work.";

"She is very adept at planning, organizing, and project management.";

Dr. Lewis has had extensive corporate and academic experience in the ID field.  She also knows what it means to be an academic leader and be responsible for curriculum development and delivery.  She has done a great job of diving in and analyzing our processes and procedures.";

"She continues to wrestle through the nuances of the Christian HE world.  All of her past experience has been in the secular HE world, and we're just a little different.  Sometimes honesty is hard for us and Emily is doing a great job of trying to honor the broader culture

while taking performance seriously.";

"Emily is communicating very well with her staff and with the peers that she works with. She is patient and attentive to external groups as well as open and honest with her direct reports.";

"Emily and the team continue to make good progress in their working relationships and adjustments to each other and the work that needs to get done in their office.  Their journey at the beginning of the year was hampered by some external influences and strained by some miscommunication.  I could have been more clear about roles and expectations at the beginning as well which would have helped things progress quicker. Emily and I are giving attention to staff relationships and building a more unified perspective within the staff.  We believe this will pay off and that we're on our way to encouraging a healthier work place."  (Ex. Q: Lewis' Performance Evaluations).

In 2017, during a meeting with Dr. Lewis and Rider, Oke instructed Dr. Lewis to "step-back" and let Rider lead the team. (Lewis Affidavit ¶ 4).  In her Complaint, Dr. Lewis characterizes this as a demotion.  It will be referred to hereafter as "the 2017 demotion".  After Dr. Lewis returned from a two-day vacation, she informed Oke that she was not going to follow the direction of Rider as she was his manager and not the other way around. (Lewis Affidavit ¶ 5).

During the 2017-2018 school year, Rider informed Dr. Lewis that he was afraid of her and that he had difficulty taking direction from her. Dr. Lewis requested that Oke organize additional training for the staff, who, for many of them, were working with an African-American for the first time. (Lewis Dep. 47:13-47:25, 49:11-49:25). In response, Oke gave a presentation where he did not mention anything about diversity, and simply spoke about being 'caring and loving'. (Lewis Dep. 54:10-54:17).

Prior to August 2018, Dr. Lewis informed Oke that she believed that her subordinates did not listen to her, did not communicate with her and were unwilling to take direction from her due

to her race. (Oke Dep. 27:23-28:04). On multiple occasions, Dr. Lewis spoke to Oke about the racial animus she believed she experienced from her staff. (Oke Dep. 28:05-28:08). Oke told her that she should simply change her leadership style, and that he didn't believe that there was any racial animus amongst her subordinates.  (Oke Dep. 19:17-19:23). Oke never spoke to any of Dr. Lewis' staff about the possibility of their inability to take direction from her due to Dr. Lewis' race. (Oke Dep. 28:09-28:15). However, according to Lewis, Oke encouraged Lewis' staff to come to him instead of her with any issues or concerns they had with Dr. Lewis and that they did not have to take direction from Dr. Lewis. (Lewis Dep. 64:14-64:18; Lewis Aff. ¶ 10).

In July 2018, Dr. Lewis met with Diane McDaniel ("McDaniel"), IWU's Diversity Officer, and Oke. ( Lewis Aff. ¶ 11). Lewis alleges that during that meeting, Oke told Dr. Lewis that she needed to get the "Black women syndrome off of [her] shoulders". (Lewis Aff. ¶ 11). Lewis further alleges that Oke also stated that Dr. Lewis was "too smart". (Lewis Dep. 76:03-76:12). After the meeting, Dr. Lewis immediately discussed Oke's comment with McDaniel and expressed how she believed the comment was racist and derogatory. (Lewis Aff. ¶ 12).

On August 6, 2018, Dr. Lewis and Oke met, and Oke informed Dr. Lewis that he intended to remove her from the position of Director of Instructional Design. ( Oke Dep. 33:10-33:24; Ex. D: Employee Action Document). After the meeting, Oke told Dr. Lewis not to come back the next day. (Oke Dep. 39:06-39:12). Oke did not provide Dr. Lewis with any further instructions regarding her employment with IWU. (Lewis Dep. 146:03-146:07. 161:01-161:19).

After the meeting, Dr. Lewis immediately contacted IWU's Chancellor, Dr. Matt Lucas ("Lucas") and McDaniel, and informed them of Oke's actions and that she believed the action

was taken due to her race. (Lewis Dep. 161:23-163:18).

On August 8, 2018, Lucas, Matt Pederson, McDaniel, and other staff members from IWU's Human Resources department met with Oke and Dr. Lewis to discuss Dr. Lewis' removal from her position and to discuss her concerns. (Oke Dep. 39:13-41:04; Ex. E: August 8, 2018 Meeting Notes). After the meeting, Dr. Lewis was sent home, and was not told her position was being changed. (Lewis Dep. 90:1-90:13). Dr. Lewis continued working from home and was given intermittent assignments for two months. (Lewis Dep. 91:16-91:23).

However, Oke created a new position for Dr. Lewis, titled Instructional Design Research and Development. (Oke Dep. 42:24-43:14; Ex. O: Instructional Design Research and Development Job Description). Oke drafted the new position personally, and had the final say on how the position was drafted.  (Oke Dep. 43:07-43:21). Dr. Lewis's new position did not include her managing any staff, and it was not a leadership role. (Oke Dep. 44:11-44:12, 46:25-47:08; Ex. F: Director of Support for Research and Learning Job Description). Dr. Lewis had no input into her new job description and when she attempted to provide input, her suggestions were disregarded. (Lewis Dep.106:01- 106:11; 108:02-108:13). Dr. Lewis fought to make the position a director level position. (Lewis Dep. 159:16-160:25). In the end, Dr. Lewis transitioned to the Director of Support for Research and Learning.  (Lewis Dep. 105:22-106:05).

Like Dr. Lewis, the prior Director of Research, a Caucasian man, had no direct reports. However, unlike Dr. Lewis, he did receive a budget for his department. (Lewis Dep. 119:13-119:25. Dr. Lewis went to Oke and requested to have a budget like the other directors, and the request was initially denied.  (Lewis Dep. 120:07-120:74; Ex. P: October 5, 2018 Letter about Budget Concerns). It was not until Dr. Lewis noted that the previous director and all the other

current directors had a budget that he approved her request. (Lewis Dep. 120:07-120:74).

Dr. Lewis was then placed on a performance improvement plan.  (Oke Dep. 46:12-46:24; Ex. G: Performance Improvement Plan). As part of the performance improvement plan, Dr. Lewis was required to complete leadership and self-perception training and coaching. (Oke Dep. 49:03-49:15). Dr. Lewis received coaching from a third-party consultant, Dr. Yvonne RB-Banks ("Dr. Banks"). (Oke Dep. 54:01-54:18; Lewis Dep. 105:10-105:15).

Dr. Banks coached Dr. Lewis for three months and at the conclusion of her coaching she provided Dr. Lewis with a positive review. (Oke Dep. 57:10:57:22).

On March 13, 2019, Crisp emailed various faculty members asking them to provide her feedback regarding Dr. Lewis. (Ex. I: March 12, 2019 Email from Crisp about Dr. Lewis Feedback)[3]. Crisp informed the faculty members that their responses would be entirely confidential. (*Id*.).

In February 2019, after Crisp spoke to Oke, she made the decision to eliminate Dr.

---

[3] This email reads as follows:

Hello SHS colleagues,
I will soon be assuming leadership for the CLI team (not yet announced publically but all CLI team members are aware), and I am trying to learn more about how I might support their growth and development as they serve our various schools.  I see that Dr. Lewis has been working with SHS quite regularly.  I would like to ask if each of you would be willing to confidentially provide an assessment of her strengths.  What has been particularly helpful?  Also, are there areas where CLI could better support either Dr. Lewis or your teams directly?  What should I know, as the soon-to-be leader, about how things are going?

As I said your responses will be entirelly confidential, used only for my own goal-setting and planning.

Lewis's position. (Crisp Dep 21:10-22:20)[4]. Dr. Lewis claims that Oke informed Crisp that he

gave Dr. Lewis a 'special treatment arrangement' as opposed to the other directors, gave Crisp

the impression that retaining Dr. Lewis was going to cause problems, and described how and why

Dr. Lewis transitioned into her current role. (Crisp Dep. 33:09-33:21, 33:22-34:17,

35:07-35:20.)[5]

---

[4]
| | |
|---|---|
| Q. | Did you talk to Dr. Oke prior to eliminating Dr. Lewis's position? |
| A. | I did. |
| Q. | And what did you guys talk about? |
| A. | I was trying – well, we were talking about merging the two teams, so I was leading a team that had one director, he was leading a team that had two directors and a vacancy, an opening for a position, and so we talked about how to merge those two teams, and, you know, talked about transition planning, what are the roles and responsibilities of each of the directors. |
| Q. | Did you al discuss Dr. Lewis? |
| A. | Yes. She was one of the directors on his team. |
| Q. | Okay.  And what did you all discuss in regards to Dr. Lewis? |
| A. | I had a lot of questions about the role and what the role was meant to accomplish, so I'm sure we discussed that. |
| Q. | And what did he say? |
| A. | He gave me the position description.  I remember that.  I remember he gave me a little background on Emily's transition from director of instructional design to director of support for research, because I didn't have a lot of awareness into what that journey had been.  Those are the specifics I can recall. |
| Q. | Why – did he tell you why she was transitioning to the new position? |
| A. | I know we talked about the fact that managing a team was a bit of a struggle, and so the new role did not have direct reports, and that was part of why the transition was happening – had happened. |
| Q. | What else did he say? |
| A. | I can't recall any other specifics of that conversation without some reminders potentially. |

[5]
| | |
|---|---|
| Q. | Okay.  Let's talk about this.  So did you and Lorne discuss Dr. Lewis's leadership ability? |
| A. | Yes. |
| Q. | Okay.  What did Lorne say to you? |
| A. | That when she was in the position of leading the instructional design team, that there were significant difficulties, and that those management |

On February 23, 2019, in an email between Crisp and Lucas, Crisp stated, after her conversation with Oke, that she had decided to eliminate Dr. Lewis's position because she saw the research component of Dr. Lewis's position as her job, that she believed she could not assign research to someone else and rely on that person's interpretation and results, and that Dr. Lewis was unable to lead or be led. Crisp told Oke that while she believed that Dr. Lewis's performance had improved, "the special treatment arrangement" that Crisp believed Dr. Lewis had with Oke was "a huge risk of culture." (Ex. J: February 23, 2019 Email from Crisp about Eliminating Dr. Lewis' Position)[6].

_____

|  |  |
|---|---|
|  | responsibilities had to be eliminated. |
| Q. | But she wasn't going to be leading anyone even in her urrent position of director of research and I think – |
| A. | Support for research. |
| Q. | Yeah.  She wasn't leading anyone; right? |
| A. | Correct. |
| Q. | Were you going to attempt to change this position to make it where she was going to have direct reports? |
| A. | No, but in my mind, that was part of the problem.  To have a director who had no direct reports felt inconsistent based on our other structures. |

                              *   *   *

|  |  |
|---|---|
| Q. | Okay. And then you said there was special treatment arrangement as a huge risk to culture.  What special treatment arrangement was there? |
| A. | If I remember our conversation correctly, Lorne explained spending a lot of time with Dr. Lewis to help her understand the tasks, the work of the director for support for research and to accomplish those tasks well, much more time than the time that he spent with other directors and certainly other members of the Center.  And to me coming in, that felt like it was going to cause problems, especially when my team was going to be larger, even larger than what Lorne's team had been. |

_____

[6] After my conversation with Lorne, I've been thinking and praying and I'm nearly certain that I want to eliminate the position - Director of support for research.  I'm glad it

Dr. Lewis's position was the only position eliminated by Crisp. (Crisp Dep 21:03-21:09). Although there was a restructuring during this time, all other positions that changed were due to not rehiring a previously vacant position. (Crisp Dep 21:03-21:09).

In April 2019, Oke resigned his position and Crisp assumed the role of the Executive Director of the Center for Learning Innovation.  (Crisp Dep. 37:22-38:7, 44: 17-25). After Crisp assumed the Executive Director position, she began to supervise Dr. Lewis. (Crisp Dep. 46:21-25). In the Spring of 2019, Crisp's title changed to the Assistant Vice President of Innovation ("AVP"). (Crisp Dep. 46: 13-19). However, she continued to supervise Dr. Lewis. (Crisp Dep. 46:13-46:25).

On June 17, 2019, Crisp informed Dr. Lewis that her position was being eliminated. (Ex. K: March 21, 2019 Email from Crisp Informing Lewis about Position Elimination). Crisp stated

---

fulfilled a need for a given season of time, but

1)   I cannot conceive of how this role will help us advance the work of the center in a meaningful way.  Research certainly helps advance the work of the center, but I see this as a major portion of my role.  I carefully considered whether I could truly hand off research projects to someone else, trust that they will interpret as I would, and use their results meaningfully without doing at least some of the research myself.  I'm sure it is a weakness on my part, lack of ability to release control, but at this point, I know that I will not be able to trust someone else to read, interpret and recommend accurately.  A research **assistant** would be very valuable, but that isn't what this position entails. [emphasis in original]

2)   The core of our culture in the center is (or will be) collaboration and a flat hierarchy.  An individual who is unable to lead or to be led will continue to undermine that culture.  Although I believe she has grown in many ways, as Lorne describes to me their current working agreement (his method of communicating with and interacting with her - getting decent work out of her), I see the special treatment arrangement as a huge risk to culture.

So now that I've made up my mind, what are my next steps?  I do not see any need to re-hire that position, so after listening to Mark's HR managers presentation last week, I am inclined to eliminate the position.  I certainly want to be fair to Emily, and I don't want to create unnecessary burden to HR or to the university, so I'd love recommendations on the best course of action..

that Dr. Lewis's role no longer served the pressing needs of the students and faculty. (*Id*.) Dr.

Lewis was then given the option to either accept a research assistant position starting on July 15,

2019, or be terminated on August 30, 2019. (*Id*.).

Crisp never officially created the research position. (Crisp Dep. 41:07-41:22). After Dr.

Lewis declined the research assistant position, the position was never filled and the

responsibilities of the position were distributed amongst Crisp's team. Crisp testified that Dr.

Lewis' duties were not "high priority responsibilities" and that was the reason her position was

eliminated. (Crisp Dep. 41:17-42:1)[7].   After Dr. Lewis' Director position was eliminated, a few

of her job duties were absorbed by employees on Crisp's team. (Crisp Dep. 23:13-24:10).

In her Complaint, Dr. Lewis alleges a variety of claims of discrimination and retaliation

under Title VII, 42 U.S.C. §1981, and the ADEA.

In support of summary judgment, IWU first argues that Dr. Lewis failed to exhaust

required Title VII and ADEA administrative remedies timely with respect to the alleged 2017

demotion and the August 2018 removal of supervisory duties.

---

[7]     Q.     Now what was the research assistant position?
        A.     That would have been a new position, not an existing one.
        Q.     Okay.  So you created the research assistant position?
        A.     I did not officially create it.  If Dr. Lewis had been interested, we would
               have created that position and hired her to do that.
        Q.     So the position wasn't officially created?
        A.     No.
        Q.     After Dr. Lewis – well, did Dr. Lewis accept the position to become the
               research assistant?
        A.     No.
        Q.     Who filled the role for the research assistant position?
        A.     No one filled that role specifically.
        Q.     Why didn't anyone fill the role?
        A.     Those were responsibilities that are distributed amongst the team.  No one
               person was tasked with filling those responsibilities.

In Indiana, a plaintiff must first file a Charge with the EEOC within 180 days of challenged adverse action for ADEA claims, and within 300 days for Title VII claims. 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(1)(A); *Daugherity v. Traylor Bros*., 970 F.2d 348, 350 n.2 (7th Cir. 1992)("Indiana is not a 'deferral state' for the purposes of the ADEA," so the 180-day statute of limitations applies); *Kennedy v. Reid Hosp. & Health Care Servs., Inc*., 279 F. Supp. 3d 819, 832 (S.D. Ind. 2017)(300-day statute of limitations applies for Title VII claims). "Failure to file a timely charge with the EEOC precludes a subsequent lawsuit under Title VII,*" Beamon v. Marshall & Ilsley Trust Company*, 411 F.3d 854, 860 (7th Cir. 2005)(citation omitted), or the ADEA, *Ajayi v. Aramark Business Services., Inc*., 336 F.3d 520, 527 (7th Cir. 2003).

In the present case, the Complaint alleges that Dr. Lewis suffered a first "demotion" when Oke purportedly told her to "step back" and let Rider lead. (Compl., ¶ 14) Rider resigned his employment with IWU on August 31, 2017, so this comment had to be made sometime before that date. (Lewis Dep. 61:22-62:1; Oke Aff., ¶ 6; Pederson Aff., ¶ 4.b.) Dr. Lewis, however, did not file her only EEOC Charge until July 8, 2019, about two years later. (Lewis Dep. 14:17-15:5 and Ex. 2). Thus, Dr Lewis' ADEA and Title VII claims with respect to the 2017 demotion are time-barred.

Similarly, Lewis' ADEA and Title VII claims related to the August 2018 removal of her supervisory duties are also time-barred. Oke met with Lewis on August 6, 2018, to inform her that based on the extremely negative feedback he had received from the entire team of IDs she would no longer be supervising them. (Lewis Dep. 89:9-20; O.D. 33:3-9 and Ex. 27; Oke Aff., ¶ 10). Further discussion was had with Dr. Lewis on August 8, 2018, in the meeting attended by Dr. Lewis, Oke, Lucas, McDaniel and Pederson concerning the reasons for this action and IWU's

14

intention to place her in a non-supervisory role. (Lewis Dep. 90:14-23; O.D. 39:18-24; 41:17-19; 42:6-17; 49:5-10 and Ex. 28; McDaniel Aff., ¶ 6; Oke Aff., ¶ 11; Pederson Aff., ¶ 5). Dr. Lewis understood that she would no longer be leading the ID team, and indeed tendered her first draft of a proposed job description for a new position the very next day, on August 9, 2018. (Lewis Dep. 103:7-9; Lewis Dep. Ex. 10; McDaniel Aff., ¶ 7). But Lewis did not file her EEOC Charge until 333 days later, on July 8, 2019, again making her Title VII and ADEA claims untimely. (Lewis Dep. 14:17-15:5 and Ex. 2).

Dr. Lewis has not responded to IWU's arguments on this point. IWU is clearly correct that Dr. Lewis's Title VII and ADEA claims, with respect to her alleged 2017 demotion and August 2018 removal of supervisory duties, are time-barred.  Thus summary judgment will be granted on these claims.

Next, IWU argues that Dr. Lewis cannot establish a *prima facie* case with respect to her §1981 claims[8] related to the alleged 2017 demotion and the August 2018 removal of supervisory

---

[8]  As this Court stated in *Jones v. Parkview Hospital, Inc.*, 2020 WL 6291462, at * 10 (N.D. Ind. Oct. 26, 2020) (Lee, J.):

> Under the *McDonnell Douglas* burden-shifting method, Jones can establish a prima facie case of race or sex discrimination under Title VII (or race discrimination under § 1981) by presenting evidence that she is a member of a protected class, that she was meeting Parkview's legitimate expectations, that she suffered an adverse employment action, and that similarly situated individuals not in her protected class were treated more favorably. *Preston v. Forge Indus. Staffing, Inc.*, 449 F.Supp.3d 845, 851 (N.D. Ind. 2020) (citing *Farr v. St. Francis Hosp. and Health Ctrs.*, 570 F.3d 829, 833 (7th Cir. 2009)). "If a plaintiff can establish these four elements, the defendant has an opportunity to articulate a legitimate, nondiscriminatory reason for its action. If the defendant does so, the burden shifts back to the plaintiff and he must offer evidence showing that the defendant's excuse is pretextual." *Id*. "This analysis is the same whether a court is analyzing a claim under Title VII or § 1981." *Id*. (citing *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007)). "At the end of the day, the Court must

duties. Claims under §1981 have a longer statute of limitations and no administrative exhaustion requirement. To support a discrimination or retaliation claim, an alleged employment action must be "materially adverse," meaning "one which visits upon a plaintiff a significant change in employment status." *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016). "Such changes can involve the employee's current wealth, his career prospects, or changes to work conditions that include humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in the workplace." *Id*.

IWU contends that there was friction between Dr. Lewis and Senior ID Rider. Oke met with Lewis and with Rider, both individually and together, on several occasions to try to mediate their differences and clarify their roles. (Lewis Dep. 47:6-12; Oke Aff., ¶ 6) Dr. Lewis contends that during one of her meetings with Oke to discuss her role and Rider's role that Oke told her to "step out of the way," which she thought meant Rider was being put in charge and she viewed as a demotion. (Compl., ¶ 14). IWU contends that Oke had no intention of demoting Dr. Lewis, but thought she was trying to exert too much control too soon without really fully understanding IWU's systems and thought it would help her and the relationship with Rider if she were to slow down and take more time to learn IWU's systems and processes before attempting to exert too much authority. (Oke Aff., ¶ 6) In any case, Lewis specifically alleges in the Complaint that she declined Oke's suggestion and continued to perform her same duties as before, so there was no change in her duties. (Compl., ¶ 14). Moreover, there was no change to Lewis' pay, benefits, or

---

determine whether a reasonable juror could conclude that Plaintiff would have kept his job if he were a member of a different class, and everything else stayed the same." *Id*. (citing *Ortiz v. Werner Enter., Inc*., 834 F.3d 760, 763 (7th Cir. 2016)).

title at that time. (Lewis Dep. 160:10-15) Thus, there was no materially adverse employment

action.  Dr. Lewis has not addressed IWU's argument in her response brief, thereby waiving any

claim related to the alleged 2017 demotion.

Next, IWU argues that the August 2018 removal of Lewis' supervision of the ID team

was not a "materially adverse employment action" either. Lewis retained the same pay and

benefits. (Lewis Dep. 160:10-15) She also remained a Director, with her title changing from

Director of Instructional Design to Director of Support for Research and Learning. *Place v.*

*Abbott Labs*., 215 F.3d 803, 810 (7th Cir. 2000)(finding plaintiff's transfer, in which she retained

same title, pay, and benefits, but lost supervisory responsibilities, was not an adverse

employment action). Dr. Lewis, in response, claims that the August 2018 action was a

"demotion" since she had different responsibilities. However, applying the Seventh Circuit's

decision in *Place*, *supra*, Dr. Lewis' loss of supervisory responsibilities does not constitute a

materially adverse employment action.  In any event, as discussed below, even if Dr. Lewis did

suffer an adverse action/demotion, she cannot meet the other elements of a *prima facie* case.

Specifically, Dr. Lewis has not shown that similarly situated individuals not in her

protected class were treated more favorably. To be "similarly situated," the individuals must be

"directly comparable" in all material respects. *Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir.

2009). This means, for example, an individual who held the same job description, was subject to

the same standards of conduct, and reported to the same decisionmaker as Dr. Lewis. *Id*. And

with respect to any such individual, Dr. Lewis must demonstrate he or she "engaged in similar

conduct without such differentiating or mitigating circumstances as would distinguish their

conduct or the employer's treatment of them." *Gates v. Caterpillar, Inc*., 513 F.3d 680, 690 (7th

Cir. 2008). "Although precise equivalence is not required, a plaintiff still needs to show that a comparator employee was treated more favorably by the same decisionmaker, even though they were both subject to the same standards of conduct and engaged in similar, but not necessarily identical, conduct." *Zayas v. Rockford Mem. Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014) (internal quotations and citation omitted).

Thus, Dr. Lewis must point to another Director who reported to Oke and who was the subject of complaints from multiple subordinates about her managerial deficiencies and dictatorial leadership. This Lewis cannot do, as Oke avers that he did not receive the same type of complaints about any other Directors. (Oke Aff., ¶ 8).  Although Dr. Lewis has pointed to favorable performance reviews, she does not dispute that Oke received complaints about her management style.  She also does not present argument or evidence that Oke received complaints about other Directors.

As there are no comparators who were treated more favorably, Dr. Lewis' claim with respect to her §1981 claims related to the alleged 2017 demotion and August 2018 removal of supervisory duties/demotion, fail.  The Court will grant summary judgment in favor of IWU on these claims.

The only claims that Dr. Lewis addresses in her response brief are (1) a §1981 claim that she was demoted in August 2018 in retaliation for a complaint of race discrimination; (2) a Title VII/ §1981 claim that her employment was terminated because of her race; and (3) a Title VII/ §1981 claim that her employment was terminated in retaliation for her previous complaint of race discrimination.  All other claims are waived and/or unsupported, as discussed above.

In her response brief, Dr. Lewis now asserts a §1981 "racial retaliation" claim based on

18

the August 2018 removal of her supervisory duties, which she now calls a demotion and asserts it was in retaliation for a complaint of racial discrimination on August 6, 2018. IWU argues that this claim was not asserted in Dr. Lewis' Complaint. IWU's argument prompted a sur-reply from Dr. Lewis contending that even if this claim wasn't specifically pled as a "demotion", IWU knew what she meant. As the parties have briefed the issue as if it were an actual, distinct claim, the Court will address their arguments herein.

First, as noted above, there was no adverse employment action as a result of this "demotion". *See Place, supra.* Second, even if there were an adverse action, Dr. Lewis has not established the required "but for" causal link element of her *prima facie* case to support her retaliation claim related to the removal of her supervisory duties. To be retaliatory, an adverse action must necessarily come after (*i.e.* in response to) protected activity. *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 302 (7th Cir. 2004) ("It is axiomatic that a plaintiff engage in statutorily protected activity before an employer can retaliate against her for engaging in statutorily protected activity.") (quotation omitted). Here, however, Dr. Lewis specifically identifies her alleged protected activity: "On August 6, 2018, Dr. Lewis informed McDaniel that she believed that she was removed from her supervisory position due to her race." (Lewis Brief, p. 22).

Obviously, however, if she was complaining that her supervisory duties had been removed because of her race then the supervisory duties had already been removed. Thus, the protected activity came <u>after</u> the alleged adverse action and therefore could not have caused that adverse action. Accordingly, this "demotion"claim fails and IWU is entitled to summary judgment on this claim.

19

Dr. Lewis' retaliatory termination claim also fails.  Dr. Lewis contends that Crisp made the decision on February 23, 2019, to eliminate Lewis' position as Director of Support for Research and Learning in retaliation for the complaint of race discrimination Lewis made to Diane McDaniel on August 6, 2018, over six and a half months earlier. IWU argues that Dr. Lewis fails to establish the required "but for" causal link between these two remotely separated events and thus cannot establish a *prima facie* case of retaliation.

"Failure to satisfy any one element of the *prima facie* case is fatal to an employee's retaliation claim." *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006)(citation omitted).  "A causal link requires more than the mere fact that an employer's action happens after an employee's protected activity." *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016) (citation omitted). IWU argues that Dr. Lewis cannot make a  causal "but for" showing here for two reasons, either of which independently doom her retaliation claim. First, there was a more than six-month time gap between Lewis' complaint of discrimination in early August 2018, and Crisp's email to Lucas on February 13, 2019 that communicated Crisp's decision to eliminate Lewis' position. Such a lengthy time gap undercuts the ability to demonstrate a causal link. *See, e.g, Harper v. C.R. England, Inc.*, 687 F.3d 297, 308 (7th Cir. 2012) (five-month gap between protected activity and adverse action too long to support inference of causation). Dr. Lewis does not address the time gap or the supporting case law in her response brief.

Secondly, Crisp had no knowledge of Lewis' previous complaint of discrimination when she made the decision to eliminate Lewis' job. (Crisp. Aff., ¶4) It is not possible for there to be a causal link between protected activity and adverse action where the decision maker had no knowledge of the protected activity at the time the decision was made. *Stephens v. Erickson*, 569

F.3d 779, 788 (7th Cir. 2009) ("Clearly, a superior cannot retaliate against an employee for a protected activity about which he has no knowledge.").  Again, Dr. Lewis has failed to address these arguments in her response brief.  As there is no evidence that Crisp even knew of Dr. Lewis' complaint of race discrimination at the time she made the decision to eliminate Lewis' position, Dr. Lewis has failed to establish the required third, "but for" causation, element of a *prima facie* case of retaliatory discharge.  These failures doom Dr. Lewis' retaliatory termination claim.  Summary judgment must be granted in favor of IWU.

<u>Discriminatory Termination Claim Based on Race</u>

Turning specifically to Dr. Lewis' claim of discriminatory termination based on her race, this claims also fails.  Even assuming that she meets the first three elements of a *prima facie* case (member of protected class, suffered an adverse employment action, and meeting employer's legitimate expectations) she cannot meet the fourth element, *i.e.* whether similarly situated employees were treated more favorably, or, under a mini-RIF theory, whether her duties were absorbed by employees not in her protected class.

As discussed above, in relation to Dr. Lewis' demotion, she has not shown that similarly situated employees not in her protected class were treated more favorably.  Dr. Lewis claims that Amber Simos, a Caucasian, was treated more favorably. However, Dr. Lewis does not explain how Simos is a valid comparator. Although she claims that Simos performed research projects, she does not address the other elements of comparator status, such as the fact that there is no evidence that other employees complained about Simos' leadership skills (or lack thereof).  Dr. Lewis must demonstrate that Simos "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of

them." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008). "Although precise equivalence is not required, a plaintiff still needs to show that a comparator employee was treated more favorably by the same decisionmaker, even though they were both subject to the same standards of conduct and engaged in similar, but not necessarily identical, conduct." *Zayas v. Rockford Mem. Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014) (internal quotations and citation omitted).

In support of her mini-RIF theory, Dr. Lewis argues that her duties were absorbed by employees not in her protected class. Without any actual analysis of the facts, Dr. Lewis states in a conclusory fashion that the other members of the support staff that reported to Crisp were all Caucasian. (Pl. Br. at 19). However, the undisputed evidence shows that although some of Dr. Lewis' minor duties were absorbed by other CLI staff, Dr. Lewis' main duties simply ceased to be done by anyone following the elimination of her position. This was because Crisp did not find them to be of importance. (Crisp Dep. 23-24, 33-34; Crisp Aff. ¶6). Crisp specifically testified on this point, indicating that Dr. Lewis' duties were not "high priority responsibilities". (Crisp Dep. 23-24). Crisp stated that Dr. Lewis' position, and its main duties, were no longer needed because it did not align with her goals and vision for the implementation of IWU's strategic plan within the CLI. (Crisp Dep. 23-24; Crisp Aff. ¶¶ 3, 6). *See Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 726 (7th Cir. 2008)(Plaintiff cannot satisfy the forth prong of the *prima facie* case where the undisputed evidence confirmed that although some of plaintiff's job duties were absorbed by members outside the protected class, some were not). In the present case, it is undisputed that Dr. Lewis' main duties were not absorbed by any other employees but, rather, simply ceased to be performed upon the elimination of Dr. Lewis' position. Thus, her

22

mini-RIF theory fails and she has not established a *prima facie* case.

In any event, even assuming that Dr. Lewis could establish a *prima facie* case, her race discrimination claim still fails because she has not shown pretext. That is, Dr. Lewis has not shown that IWU's legitimate, non-discriminatory reason for eliminating her position (*i.e.* that Crisp did not believe Dr. Lewis' position advanced her goals for the CLI in accordance with her vision of IWU's strategic plan) was pretextual. As IWU notes, there is no evidence to dispute the honesty of Crisp's reasoning, as her reason was consistently stated and also based in fact. *See Skiba v. Illinois Central Railroad Co.* 884 F.3d 708, 724 (7th Cir. 2018)("The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain [its action]"); *see also Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557 (7th Cir. 1987)("A district judge does not sit in a court of industrial relations. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, Title VII and §1981 do not interfere. . . . The employee must show that race is the dispositive factor."). Although Dr. Lewis strings together a set of unrelated comments, taken out of context, in an attempt to show that Crisp's proffered reason for removing her from her position is not credible, this attempt fails. The evidence, taken as a whole, clearly and undisputedly shows that Crisp consistently held the opinion that Dr. Lewis' position was no longer needed. Dr. Lewis makes much of the fact that Crisp delegated a few research duties to other employees. However, Dr. Lewis was offered a Research Assistant position, which she turned down. Thus, it was not contradictory for Crisp to then assign research duties to other employees. The bottom line here is that there is simply no evidence that Dr. Lewis' race played any part in any employment decision at issue. Dr. Lewis has essentially

23

argued that since she was the only Black Director, and only her position was eliminated, she can prevail on her race discrimination clam.  This argument is fatally flawed.  There is no evidence that race played any role in Dr. Lewis' alleged constructive discharge, and thus no reasonable jury could find in her favor. Therefore, for all the foregoing reasons, summary  judgment must be granted in favor of IWU on Dr. Lewis'  race discrimination claim, as well as on all of her other claims, as discussed above.

<u>Conclusion</u>

On the basis of the foregoing, IWU's motion for summary judgment [DE 36] is hereby GRANTED.  Further, Dr. Lewis' motion for leave to file sur-reply [DE 50] is also hereby GRANTED.


Entered: July 7, 2022.


s/ William C.  Lee
William C. Lee, Judge
United States District Court

24